# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| HENRY ZOCH II, Individually and on behalf of the Estate of Henry Zoch III, Deceased | § § § § § § § § | |
| v. | | Civil Action No. 4:17-CV-578<br>Judge Mazzant |
| DAIMLER, A.G., et al. | | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are the following motions:

- Defendants Daimler, AG; Mercedes-Benz USA, LLC; and PAG Distributor S1, LLC's, Motion to Exclude the Testimony of Plaintiff's Expert Brian Herbst (Dkt. #258);

- Defendants' Motion to Exclude the Testimony of Plaintiff's Expert Michelle Hoffman (Dkt. #259);

- Plaintiff Henry Zoch II's, individually and on behalf of the Estate of Henry Zoch III ("Zoch III"), Motion to Exclude the Testimony of Karl Heinz Bauman (Dkt. #260);

- Plaintiff's Motion to Exclude the Testimony of Dr. Catherine Corrigan (Dkt. #262); and

- Plaintiff's Motion to Exclude Opinions of Defendants' Retained Testifying Expert Dr. Edward Caulfield (Dkt. #264).

Having considered the motions and relevant pleadings, the Court finds the first four motions should be denied (Dkt. #258; Dkt. #259; Dkt. #260; Dkt. #262) and reserves its ruling on the last motion (Dkt. #264).

### BACKGROUND

This is a products liability case arising from the alleged failure of the driver's seat in Henry Zoch III's ("Zoch III") vehicle—a 2008 Smart Fortwo—during a rear-end collision (Dkt. #52). As a result of the collision, Zoch III suffered a severe head injury and later died. Subsequently, Plaintiff filed suit on February 16, 2016 (Dkt. #1).

August was a busy month for the parties. On August 10, 2018, the parties filed the motions at issue (Dkt. #258; Dkt. #259; Dkt. #260; Dkt. #262; Dkt. #264). The parties filed responses to the motions on August 17, 2018 (Dkt. #275; Dkt. #279; Dkt. #281; Dkt. #287; Dkt. #292). The parties filed replies to the motions on August 21, 2018 (Dkt. #302; Dkt. #303; Dkt. #304; Dkt. #305; Dkt. #306).

## LEGAL STANDARD

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court instructed courts to function as gatekeepers, and determine whether expert testimony should be presented to the jury. 509 U.S. 579, 590–93 (1993). Courts act as gatekeepers of expert testimony "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The party offering the expert's testimony has the burden to prove that: (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable. *Daubert*, 509 U.S. at 590–91. A proffered expert witness is qualified to testify by virtue of his or her "knowledge, skill, experience, training, or education." FED. R. EVID. 702. Moreover, to be admissible, expert testimony must be "not only relevant but reliable." *Daubert*, 509 U.S. at 589. "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kuhmo*, 526 U.S. at 147).

In deciding whether to admit or exclude expert testimony, the Court should consider numerous factors. *Daubert*, 509 U.S. at 594. In *Daubert*, the Supreme Court offered the following, non-exclusive list of factors that courts may use when evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Id.* at 593–94; *Pipitone*, 288 F.3d at 244. When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Daubert*, 509 U.S. at 595.

The *Daubert* factors are not "a definitive checklist or test." *Id.* at 593. As the Supreme Court has emphasized, the *Daubert* framework is "a flexible one." *Id.* at 594. The test for determining reliability can adapt to the particular circumstances underlying the testimony at issue. *Kuhmo*, 526 U.S. at 152. Accordingly, the decision to allow or exclude experts from testifying under *Daubert* is committed to the sound discretion of the district court. *St. Martin v. Mobil Expl. & Producing U.S., Inc.*, 224 F.3d 402, 405 (5th Cir. 2000) (citations omitted). Despite this discretion, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system: 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., State of Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996) (quoting *Daubert*, 509 U.S. at 595).

# ANALYSIS

## I. Brian Herbst

Plaintiff designated Mr. Brian Herbst as a professional mechanical engineer and an expert in automotive safety who will provide testimony "that the subject vehicle is defective and unreasonably dangerous due to the design of its cabin structure and seating system . . . [and] that Defendants were negligent in their actions and omissions related to the design of the subject vehicle." (Dkt. #258-1 at p. 3). Defendants move to exclude Mr. Herbst's testimony contending he "lacks the necessary background, training, education, and experience to render expert opinion testimony regarding the design of the smart fortwo" and his "opinion testimony related to safer alternative designs is unreliable because it is not supported by relevant, reliable testing or a correct understanding or sound analysis of the subject accident." (Dkt. #258 at p. 1). Defendants also argue that Mr. Herbst does not provide evidence that his proposed safer alternative designs were economically feasible at the time Defendants manufactured the Smart Fortwo (Dkt. #258 at pp. 9, 13; Dkt. #305 at p. 4). The Court addresses each argument in turn.

### A. Necessary Background, Training, Education, and Experience

Defendants first claim that Mr. Herbst lacks the necessary background to testify as an expert because he "has never worked for an automobile manufacturer and has never been involved in the design of vehicle seats or structures for commercial vehicles." (Dkt. #258 at p. 6). Defendants continue, "Plaintiff is unable to present any direct experience of Mr. Herbst related to designing vehicles or vehicle components, particularly with respect to vehicle structural or driver's seat design alternatives." (Dkt. #305 at p. 2).

The party offering the expert's testimony has the burden to prove that the expert is qualified. *Daubert*, 509 U.S. at 590–91. Plaintiff responds to Defendants' arguments:

> Mr. Herbst's opinions are based upon his education, training and experience as a Professional Engineer, in addition to his experience as a researcher, test engineer and automotive safety engineer involved with numerous studies in the field of accident investigation and automotive safety, particularly related to the field of automotive crashworthiness. Mr. Herbst's engineering experience has spanned more than 20 years, almost all of which has related directly to motor vehicle testing, crashworthiness, restraint system, and structural analysis. Mr. Herbst has been called upon to analyze several hundred real world accidents.

(Dkt. #287 at p. 8).

The Court concludes Mr. Herbst possesses the necessary background, training, education, and experience to testify regarding automotive structure and seat design. Mr. Herbst's curriculum vitae includes multiple items relating to Mr. Herbst's experience in analyzing automotive structures and seat design. First, Mr. Herbst holds a mechanical engineering degree and is currently employed as a Senior Engineer at Safe Laboratories, LLC (Dkt. #254-4). As a Senior Engineer, Mr. Herbst "research[es], design[s], implement[s], and test[s] alternative automotive safety systems" and publishes automotive safety technical publications (Dkt. #258-4 at p. 3). Mr. Herbst states that he is "routinely called upon to evaluate vehicle accidents and to analyze, test, and evaluate various vehicle safety systems." (Dkt. #287-1 at 3). Additionally, fifteen of Mr. Herbst's publications relate to the topic of automotive structure and design.[1] Finally, Mr. Herbst

---

1. (1): "The Ability of 3 Point Safety Belts to Restrain Occupants in Rollover Crashes;" (2) "Restraint Effectiveness During Rollover Motion;" (3) "The Effects of Pretensioning on 3-Point Safety Belts on Occupants in Rollover Crashes;" (4) "Three-Point Restraint System Design Considerations for Reducing Vertical Occupant Excursion in Rollover Environments;" (5) "Reinforcing Automotive Roofs with Composite Materials;" (6) "Studies of Vehicular Padding Materials;" (7) "The Effect of Vertical Acceleration on Emergency Locking Seatbelt Retractors;" (8) "Biomechanical Analysis of Motor Vehicle Seat Belt Buckles;" (9) "Roof Crush Mitigation Techniques to Enhance Occupant Protection;" (10) "Epoxy Reinforcing for Rollover Safety;" (11) "Evaluation of Motor Vehicle Seatbelt Retractor Locking Devices;" (12) "Rollover Roof Strength Improvements Using Epoxy Reinforcement;" (13) "The Effect of Vertical and Multiplanar Accelerations on Differing Production Seat Belt Sensor Designs;" (14) "Webbing Sensitivity as a Means for Limiting Occupant Excursion in Rollovers;" and (15) "Designing Roof Structures for Real-World Rollovers." (Dkt. #258-4 at pp. 3–9).

is also a registered Professional Engineer and a member of the Society of Automotive Engineers (Dkt. #258-4).

At this stage in the proceeding, the Court acts as a gatekeeper of expert testimony. *See Kuhmo*, 526 U.S. at 152. The evidence presented demonstrates that Mr. Herbst possesses nearly 25 years of experience in analyzing automotive accidents, design and structure, and safety (Dkt. #258-4). Accordingly, the Court finds that Mr. Herbst possesses the necessary background, training, education, and experience to testify. Defendants' argument that Mr. Herbst has not worked for an automobile manufacturer and has never been involved in the design of automobile seats is better suited for cross-examination. *See Daubert*, 509 U.S. at 595 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *see also United States v. Wen Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013) ("[An expert's] lack of specialization should generally go to the weight of the evidence rather than its admissibility.").

### B. Safer Alternative Designs

Mr. Herbst opines that at the time Defendants designed and manufactured the 2008 Smart Fortwo, alternate seat designs were available which would have resulted in a non-defective and safer seat (Dkt. #258-2 at p. 16). Specifically, Mr. Herbst provides the following alternative designs: (1) luggage compartment cover bar; (2) bulkhead reinforcement; (3) high retention seat back; (4) pelvic catcher; (5) dual recliner; and (6) All-Belts-To-Seat ("ABTS")/Seat Integrated Restraint ("SIR") systems (Dkt. #258-2 at pp. 6–10).

Defendants contend that "[Mr.] Herbst has no reliable testing to show that his supposedly 'safer' alternative designs would have prevented Zoch III's injuries during the subject accident or are in fact 'safer' when taking into account all potential crash scenarios." (Dkt. #258 at p. 8).

6

Defendants explain that Mr. Herbst did not conduct testing on five of the six proposed alternative designs, and the testing performed on the sixth alternative design is unreliable and inadmissible (Dkt. #258 at pp. 9–14). Plaintiff claims that Defendants misapply the applicable standards of proof and ignore testing performed by Mr. Herbst (Dkt. #287 at pp. 10–12).

To prevail on a design defect case, a plaintiff must show: (1) because of its defective design the product is unreasonably dangerous; (2) a safer alternative design exists; and (3) the defective design was the producing cause of the plaintiff's injuries. *Flock v. Scripto–Tokai Corp.*, 319 F.3d 231, 236 (5th Cir. 2003). A safer alternative "must substantially reduce the risk of injury and be both economically and technologically feasible." *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex. 1999). "Texas law expects that an alternative design be tested before a jury can reasonably conclude that the alternative would prevent or reduce the risk of injury." *Casey v. Toyota Motor Eng'g & Mfg. N. Am., Inc.*, 770 F.3d 322, 332 (5th Cir. 2014). "This testing need not entail actually constructing a model[,] . . . testing can be as simple as applying math and physics to establish the viability of a design." *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 407 (5th Cir. 2016); *see also Sanchez*, 997 S.W.2d at 592 (qualified expert testimony on the issue suffices, even though the expert has produced no prototype, if it reasonably supports the conclusion that a reasonable alternative design could have been practically adopted at the time of sale); *Riley v. Ford Motor Co.*, 2:09-CV-148-KS-MTP, 2011 WL 2728266, at *6 (S.D. Miss. July 12, 2011) (citing *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 990 (5th Cir. 1997)) (an expert's "failure to test the alternative design is not, by itself, sufficient to bar his testimony."). "[A] claimant can establish the technical feasibility of a safer alternative design by showing its use by others in the industry." *Sims*, 839 F.3d at 406 (citing *Goodner v. Hyundai Motor Co., Ltd.*, 650 F.3d 1034, 1043–44 (5th Cir. 2011)).

### i. "Untested" Alternative Designs

Defendants allege Mr. Herbst provides no reliable testing to support the following proposed alternatives: (1) bulkhead reinforcement; (2) high retention seat back; (3) pelvic catcher; (4) dual recliner; and (5) ABTS/SIR design (Dkt. #258 at p. 8).

- **Bulkhead Reinforcement:** Mr. Herbst opined in his report:

    > Seats in regular cab pickup trucks, such as the Toyota Tacoma . . . , are supported by the rear of the body structure. Seats in two-seater cars, such as the Toyota MR2 . . . , are supported by the rear structure. . . . As a result, these seats can resist an extremely high force level. Their deformation is limited in a rear crash because the seat will engage and be supported by the rear structure.

(Dkt. #258-2 at p. 7). Here, Mr. Herbst establishes the technical feasibility of a safer alternative design by showing its use in other vehicles and explains why seats supported by bulkhead reinforcement can resist a higher force level and are safer.

- **High Retention Seat Back:** Mr. Herbst cites the patent for a high retention seat back to explain why such a design would be safer: "It is known that good retention of the occupant in a seat occurs even if the seat back unit thereof deflects rearwardly to a position of a substantial angle from a vertical plane passing through its pivotal connection with the seat unit." (Dkt. #258-2 at p. 7). Here, Mr. Herbst shows the technical feasibility of his safer alternative design and explains why the design is a safer alternative.

- **Pelvic Catcher:** Again, Mr. Herbst cites a patent to explain why the pelvic catcher is a safer alternative design, "in a crash situation [the pelvic catcher] plastically deforms, directing the pelvic region of a seated occupant in a downward motion to capture the pelvic region of a seated occupant between itself and a lower bun frame of the vehicle seat." (Dkt. #258-2 at p. 8).

- **Dual Recliner:** Mr. Herbst specifically cites publications which tested single recliner and dual recliner seats and determined that dual recliners were stiffer, stronger, and exhibited less

twisting than single recliners. In other words, Mr. Herbst provides the testing Defendants allege he does not.

- **ABTS/SIR:** Mr. Herbst concludes that seats referred to as ABTS/SIR are "shown to provide both the benefits of increased strength, energy absorption and improved occupant retention capability." (Dkt. #258-2 at p. 9). Mr. Herbst then provides six figures showing post-test comparisons between weaker and stronger seats—including two figures showing a Chrysler Sebring equipped with ABTS seats (Dkt. #258-2 at p. 9). Once more, Mr. Herbst provides the testing that Defendants allege he does not.

Reviewing the five "untested" alternative designs and applying the relevant legal standard outlined above, the Court finds that Mr. Herbst's "untested" safer alternative designs are admissible as Mr. Herbst provides adequate explanation or testing on each alternative design to show that the designs are safer. *See Sims*, 839 F.3d at 407; *Sanchez*, 997 S.W.2d at 592; *Riley*, 2011 WL 2728266, at *6.

### ii. "Tested" Alternative Design

Mr. Herbst conducted three sled tests to demonstrate that replacing the luggage compartment cover bar with a structural steel tube would be a safer alternative design of the 2008 Smart Fortwo (Dkt. #258-2 at pp. 11–15). Defendants argue Mr. Herbst's sled tests are unreliable and inadmissible for three reasons: (1) Mr. Herbst used a recline angle set by Plaintiff's expert Michelle Hoffman; (2) the velocity changes of the sled tests were less than the velocity change determined by Plaintiff's expert Steve Irwin; and (3) Mr. Herbst did not consider different accident scenarios (Dkt. #258 at pp. 10–11). Defendants do not explain why these factors render Mr. Herbst's sled tests unreliable or whether altering these variables would change Mr. Herbst's results.

9

If Defendants believe the above testing and explanation are inadequate, they should demonstrate so on cross-examination of Mr. Herbst. *See Daubert*, 509 U.S. at 595. However, at this stage in the proceeding, Mr. Herbst adequately demonstrates that his testimony on safer alternative designs is at least admissible.

## C. Economic Feasibility

In passing in their motion, and more thoroughly in their reply, Defendants contend Mr. Herbst does not provide evidence that his proposed safer alternative designs were economically feasible when Defendants designed and manufactured the 2008 Smart Fortwo (Dkt. #258 at pp. 9, 13; Dkt. #305 at p. 4). However, the corporate representative for Defendants' seat supplier— William Tighe— testified:

> We have the technical capability of offering alternatives, if needed. These tests we have been reviewing are done on rigid fixtures. I don't know that it represents any concern at all to the vehicle level. But had Daimler asked us to work to a different standard or asked us to do something that would influence the behavior in the vehicle, we had the technical capability. We would have offered design alternatives and ultimately Daimler would have decided which alternative to pick if they needed one.

(Dkt. #287-4 at p. 47). Although not specific to Mr. Herbst's alternatives, it appears Defendants' seat manufacturer was capable of producing and incorporating any number of alternative designs requested by Defendants. *See Boatland of Hous., Inc. v. Bailey*, 609 S.W.2d 743, 746 (Tex. 1980) (feasibility may be shown with evidence of the scientific and economic capacity to develop the safer alternative). Due to the previous discussion, the Court **DENIES** Defendants' Motion to Exclude the Testimony of Plaintiff's Expert Brian Herbst (Dkt. #258).[2]

---

2. Defendants object to, and move to strike, Mr. Herbst's affidavit attached as Exhibit B to Plaintiff's response (Dkt. #305 at p. 4). The Court did not rely on Mr. Herbst's affidavit in reaching its decision and therefore **OVERRULES** Defendants' objection.

## II. Michelle Hoffman

Plaintiff designated Michelle Hoffman as "an expert in biomechanics and biomedical engineering" who will provide "expert testimony regarding the subject incident, body kinematics of the subject vehicle's occupants during the subject incident, the nature and mechanism of resulting injuries, the forces and direction of forces necessary to produce such injuries, and the proximate cause(s) of such injuries." (Dkt. #259-1 at p. 1). In her report, Ms. Hoffman describes a "surrogate inspection" she conducted in Zoch III's vehicle (Dkt. #259-1 at pp. 4–8). The inspection consisted of Ms. Hoffman placing a surrogate—one of Plaintiff's attorneys—in the driver's seat of Zoch III's vehicle (Dkt. #259-1 at pp. 4–8).

Defendants move to exclude Ms. Hoffman's opinions that rely on the surrogate inspection and to exclude any photographs, measurements, or descriptions of the inspection because the inspection is "too disconnected from the subject crash to be a reliable basis for any opinions." (Dkt. #259 at p. 4). Specifically, Defendants argue that the surrogate's height and weight are different from Zoch III's height and weight, and Ms. Hoffman's estimates concerning the position of the seat, seatbelt, and surrogate are unreliable (Dkt. #259 at pp. 4–6).

Defendants do not attack the reliability of surrogate studies generally. Instead, Defendants challenge the specific bases and sources employed by Ms. Hoffman. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)). The general rule applies in this case.

Ms. Hoffman states in her report that the surrogate study was not intended to be an exact recreation of Zoch III's body kinematics:

11

> There is no way to dynamically replicate the occupant kinematics is a static situation; however, to get a general idea of body position when the body moves upward and inboard as demonstrated in crash testing, the surrogate was asked to push[ ] against the floor and raise his torso and head toward the back of the vehicle.

(Dkt. #259-2 at 5). Consequently, the Court does not believe that the height and weight difference between the surrogate and Zoch III will prevent the jury from obtaining a "general idea" of Zoch III's body movement from the surrogate inspection. Even so, nothing prevents Defendants from discrediting the surrogate inspection on cross-examination by demonstrating the height and weight difference between Zoch III and the surrogate.

Regarding the position of the driver's seat, seatbelt, and surrogate in the vehicle, it does not appear that Ms. Hoffman's estimates are random or unreliable. Ms. Hoffman adjusted the driver's seat to a point where "the guide loop on the seat back was aligned with the abrasion on the [seat] belt webbing." (Dkt. #259-2 at p. 4). According to Ms. Hoffman, "I did not place the seat in any position other than where those marks lined up with the guide rings." (Dkt. #281-3 at p. 21). In her deposition, Ms. Hoffman noted that the abrasions on the seatbelt were caused by the loading from Zoch III's body during the collision (Dkt. #281-3 at p. 20). Therefore, Ms. Hoffman positioned the driver's seat, seatbelt, and surrogate in an arrangement she believed represented the positions of the seat, seatbelt, and Zoch III at the time of the collision based on her analysis of the abrasion marks caused by the loading of Zoch III's body.

Due to the preceding discussion, the Court concludes that Ms. Hoffman's surrogate inspection is admissible. Defendants' arguments concerning the sources and bases of Ms. Hoffman's inspection goes to the weight of the evidence, not its admissibility. Accordingly, the

Court **DENIES** Defendants' Motion to Exclude the Testimony of Plaintiff's Expert Michelle Hoffman (Dkt. #259).[3]

### III. Karl Heinz Bauman

Karl Heinz Bauman is a member of the Senior Expert Program at Daimler AG who Defendants designated as an expert in this case (Dkt. #264-3 at pp. 4–5). Mr. Bauman is "a native German speaker who is not fluent or proficient in the English language . . . ." (Dkt. #275 at p. 1). Plaintiff moves to exclude Mr. Bauman as an expert witness because Plaintiff contends Dr. Bauman's report "is nothing more than a lawyer written document designed to permit Mr. Bauman to opine on all relevant issues the lawyers wish." (Dkt. #260 at p. 2). Defendants admit that an attorney assisted Mr. Bauman in preparing his report but insist the attorney did not "ghost-write" the report (Dkt. #275 at pp. 2–5).

This Court has recently addressed this issue in a different case:

> Rule 26(a)(2)(B) requires that an expert report be "prepared and signed by the witness," but an attorney may assist the expert in drafting the report:
>
> "Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports, and indeed, with experts such as automobile mechanics, this assistance may be needed. Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness."
>
> FED. R. CIV. P. 26 advisory committee's note (1993). Thus, Rule 26 contemplates some attorney involvement in the preparation of an expert report. *Estate of LaFarge ex rel. Blizzard v. Kyker*, No. 1:08CV185, 2011 WL 6151595, at *6 (N.D. Miss. Dec. 12, 2011). "Several courts have addressed the permissible amount of attorney involvement in drafting an expert report" and "conclude[d] that as long as the substance of the opinions is from the expert, the

---

3. Defendants object to, and move to strike, Ms. Hoffman's affidavit attached as Exhibit B to Plaintiff's response (Dkt. #306 at p. 4). The Court did not rely on Ms. Hoffman's affidavit in reaching its decision and therefore **OVERRULES** Defendants' objection.

13

attorney's involvement in the written expression of those opinions does not make them inadmissible." *Seitz v. Envirotech Sys. Worldwide Inc.*, No. H-02-4782, 2008 WL 656513, at *2 (S.D. Tex. Mar. 6, 2008). One court recognized that "'some attorney involvement in the preparation of an expert report is permissible' as long as the expert 'substantially participate[s] in the preparation of an expert report.'" *Id*. (quoting *Manning v. Crockett*, No. 95 C 3117, 1999 WL 342715, at *3 (N.D. Ill. May 18, 1999)). However, "[a]llowing an expert to sign a report drafted entirely by counsel without prior substantive input from an expert would read the word 'prepared' completely out of the rule." *Id*. (quoting *Manning*, 1999 WL 342715, at *3).

*Tech Pharmacy Servs., LLC v. Alixa Rx LLC*, 4:15-CV-766, 2017 WL 3388020, at *2 (E.D. Tex. Aug. 3, 2017). Therefore, the question before the Court is whether Mr. Bauman was sufficiently involved in the drafting of his expert report such that it was "prepared and signed by the witness" as required by Rule 26.

In his deposition, Mr. Bauman testified:

> Q. The report is in English. Did you write the report in English?
>
> A. Since English is not my native tongue, and I speak English very poorly, I took notes, yes; and when I discussed these notes with native English speakers, who then helped me to generate this English version.
>
> Q. Were some of the native English speakers who helped you the lawyers in this case?
>
> A. Yes.
>
> Q. Are you confident that the version that's marked as Exhibit 1 in English is an accurate report of your opinions?
>
> A. Yes. I rely on that.
>
> Q. But more importantly, I can rely on this report as being accurate?
>
> A. I must, and can, rely on the fact that this report accurately reflects my opinions.
>
> . . . .

> Q. I am referring to the notes that you testified earlier were reformulated into the English report.
>
> A. There are no such notes. I have notes here of the vehicle inspection.
>
> Q. So can you describe for me how it is that your report came to be written in English?
>
> A. I generated the formulations, written concepts, and I discussed them with native English-speaking colleagues, which then ultimately resulted in this English language report.
>
> Q. The native English-speaking people that you are describing as colleagues are the lawyers for Daimler in this case; is that correct?
>
> [Objection Omitted]
>
> A. Yes.

(Dkt. #260-2 at pp. 2, 18).

Reviewing the above testimony, this is "not a case in which an expert signed 'a report drafted entirely by counsel without prior substantive input from an expert.'" *Seitz*, 2008 WL 656513, at *3 (quoting *Manning*, 1999 WL 342715, at *3). Instead, Mr. Bauman took notes, generated the formulation and written concepts of his opinion, and then discussed his opinion with the attorney who drafted the report. Further, Mr. Bauman testified that the report accurately reflects his opinion. Therefore, it appears the "substance of the opinion[ ] is from the expert" and Mr. Bauman's testimony is admissible. *Id.* at *2. Accordingly, the Court **DENIES** Plaintiff's Motion to Exclude the Testimony of Karl Heinz Bauman (Dkt. #260).

## IV. Dr. Catherine Corrigan

Defendants designated Dr. Catherine Corrigan as an expert who will "testify concerning biomechanical issues, including biomechanics of human injury, occupant kinematics, and injury

mechanism." (Dkt. #264-1 at p. 2). In her report, Dr. Corrigan opined that Zoch III's head was turned somewhat to the right at the time of impact (Dkt. #262-1 at p. 33–34).

Plaintiff claims Dr. Corrigan "has no scientific basis whatsoever to know how Mr. Zoch's head was positioned before the subject accident . . . ." (Dkt. #262 at p. 3). Accordingly, Plaintiff moves to strike Dr. Corrigan's injury causation opinions because they "are based purely on speculation and an *ipse dixit* conclusion that is so speculative that it should not be presented to the jury." (Dkt. #262 at pp. 2, 4). Defendants respond that Dr. Corrigan's opinion concerning Zoch III's pre-impact head position is substantially supported by the evidence (Dkt. #279 at p. 9).

"The relevance prong requires the proponent to demonstrate that the expert's 'reasoning or methodology can be properly applied to the facts in issue.'" *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (quoting *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999)). "To establish reliability under *Daubert*, an expert bears the burden of furnishing 'some objective, independent validation of [her] methodology.'" *Brown v. Ill. Cent. R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013) (quoting *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)). "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury." *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) (quoting *Viterbo*, 826 F.2d at 422).

Dr. Corrigan provides support for her opinion that Zoch III's head was turned somewhat to the right as the impact occurred. First, Dr. Corrigan determined that Zoch III remained in the driver's seat during the collision (Dkt. #279-3 at pp. 33–34; Dkt. #279-4 at pp. 28–29). Based on this conclusion, Dr. Corrigan examined Zoch III's injuries:

> For a fully forward-facing occupant in a rear impact, the expected head kinematics consist primarily of rearward translation combined with later sagittal plane rotation. In the case of Mr. Zoch, the physical evidence (head laceration biased to the right and broad subscalpular hemorrhage over the right frontal, temporal and

16

parietal portions of the head) indicates that his head was turned somewhat to the right at the time of the impact.

(Dkt. #279-3 at p. 35).[4,5] Further, Dr. Corrigan analyzed the driver's seat head restraint:

> The underlying structure of the head restraint on the subject Smart vehicle incorporated a steel reinforcement plate welded to the front of steel tubing. This head restraint plate on the driver's seat of the subject vehicle was significantly dented rearward with respect to a nominal seatback position, and the maximum deformation appeared to be on the lower and outboard aspect of this structure (Figure 12). This damage was the result of impact from Mr. Zoch's head as its rearward and rotational motion was rapidly slowed by the head restraint.

(Dkt. #279-3 at p. 34). Consequently, Dr. Corrigan determined that Zoch III's head was turned to the right at the time of impact based upon her conclusion that Zoch III remained in his seat and her analysis of Zoch III's injuries, her surrogate inspection, and the driver's seat head restraint.

Therefore, Dr. Corrigan did not simply assume or speculate as to Zoch III's pre-impact head position. Instead, she grounds her opinion on her review of the evidence and her application of different methodologies that Plaintiff does not challenge. Accordingly, the Court **DENIES** Plaintiff's Motion to Exclude the Testimony of Dr. Catherine Corrigan (Dkt. #262).

## V.    Dr. Edward Caulfield

Plaintiff moves to exclude all testimony and opinions of Defendants' designated expert Dr. Edward Caulfield because Defendants failed to comply with Federal Rule of Civil Procedure 26(b)(4)(A) (Dkt. #264).

Defendants designated Dr. Caulfield as an "expert in the fields of metallurgical principles, mechanical behavior of materials, stress and failure analysis[,] and mechanical engineering" and

---

4. Dr. Corrigan also examined Zoch III's internal head injuries and determined that such injuries occur with "rotational accelerations" of the head (Dkt. #279-3 at p. 35).
5. Additionally, Dr. Corrigan noted a gap between the head of her surrogate and the head restraint of the driver's seat of two to six inches (Dkt. #279-3 at p. 30). According to Dr. Corrigan, such a gap could generate the velocity required to create Zoch III's injuries (Dkt. #279-3 at pp. 32–33).

17

produced Dr. Caulfield's expert report (Dkt. #264-1 at p. 3; Dkt. #292-2). Plaintiff attempted to depose Dr. Caulfield in July 2018, but Defendants canceled the deposition due to Dr. Caulfield's health (Dkt. #264 at p. 2). According to Defendants, Dr. Caulfield became seriously ill sometime around May 2018, and cannot return to work in his previous capacity (Dkt. #292 at pp. 1–2). Due to Dr. Caulfield's health, Defendants advised Plaintiff that they would withdraw Dr. Caulfield as an expert witness and told Plaintiff that other experts—including Dr. Greg Smith—would address areas that Dr. Caulfield was previously designated to address (Dkt. #292 at p. 2). Defendants also informed Plaintiff than Nicole Schimpf—Dr. Caulfield's colleague—was available for deposition to provide a complete disclosure of Dr. Caulfield's work and analysis (Dkt. #292 at p. 2).

Plaintiff attempted to discuss Dr. Caulfield's opinions with Dr. Smith during Dr. Smith's deposition (Dkt. #264-7). However, Plaintiff learned that Dr. Smith had not spoken with Mr. Caulfield and would not adopt all of Dr. Caulfield's report (Dkt. #264 at p. 6). Specifically, Dr. Smith intends to rely on Dr. Caulfield's metallurgy analysis but will not provide expert testimony on the subject (Dkt. #264-7 at p. 25).[6,7] Regarding Defendants' offer to depose Ms. Schimpf, Plaintiff states that Ms. Schimpf has not been designated as an expert or disclosed as a witness, nor does she share the same credentials as Dr. Caulfield (Dkt. #304 at p. 3). Overall, Plaintiff fears that Defendants will "backdoor" Dr. Caulfield's opinions into evidence through other experts without offering an expert to support his opinions in a deposition or at trial.

Federal Rule of Civil Procedure 26(b)(4)(A) provides that a party may "depose any person who has been identified as an expert whose opinions may be presented at trial." *See Hoover v.*

---

6. Dr. Smith testified: "I see two parts to that. One is there's an area that I don't plan to testify on that I would be relying on [Dr. Caulfield's] report as support, and that would be the metallurgy area. I don't plan to give expert testimony about the metallurgy work that was done. . . . So I rely on that part of his report without doing the work that he did." (Dkt. #264-7 at pp. 18–19).
7. Plaintiff notes that other experts in this case also rely on Dr. Caulfield's opinions (Dkt. #264-8 at p. 30; Dkt. #264-9 at p. 18).

18

*U.S. Dept. of the Interior*, 611 F.2d 1132, 1142 (5th Cir. 1980) ("The primary purpose of [Rule 26(b)(4)(A)'s] required disclosure[s] is to permit the opposing party to prepare an effective cross-examination."). If Defendants intend to offer Dr. Caulfield's opinions at trial, Dr. Caulfield must be deposed in order to provide Plaintiff an opportunity to prepare an effective cross-examination. Otherwise, Defendants must go without the testimony or find a suitable substitute who can be deposed in time for trial. *See Morel v. Daimler-Chrysler Corp.*, 259 F.R.D. 17, 20 (D.P.R. 2009) ("Death [or sickness] of an expert witness falls squarely within the category of circumstances that require a late disclosure; the only question regarding justification is whether the party waited too long to notify the Court of the need for a new expert."). Accordingly, the Court **RESERVES** its ruling on Plaintiff's Motion to Exclude Opinions of Defendants' Retained Testifying Expert Dr. Edward Caulfield until Plaintiff deposes Dr. Caulfield or Defendants offer a substitute expert who may be deposed in time for trial (Dkt. #264).

## CONCLUSION

Due to the preceding discussion, the Court **DENIES** the following motions:

- Defendants' Motion to Exclude the Testimony of Plaintiff's Expert Brian Herbst (Dkt. #258);

- Defendants' Motion to Exclude the Testimony of Plaintiff's Expert Michelle Hoffman (Dkt. #259);

- Plaintiff's Motion to Exclude the Testimony of Karl Heinz Bauman (Dkt. #260); and

- Plaintiff's Motion to Exclude the Testimony of Dr. Catherine Corrigan (Dkt. #262).

The Court **RESERVES** its ruling on Plaintiff's Motion to Exclude Opinions of Defendants' Retained Testifying Expert Dr. Edward Caulfield (Dkt. #264).

**SIGNED this 25th day of September, 2018.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE